Before we begin the call this morning, for the record, Justice Hoffman is unable to be with us today and I want the record to reflect that he's a fully participating member of this court and on this panel and on every case to be heard today. He has the full benefit, of course, of the written briefs, as we all do, but he'll also have the full benefit of the oral arguments as these oral arguments are recorded, as you may know. So with that, for the record, we can begin the call this morning. Please call the first case. 140388 J Squared Masonary v. Workers' Compensation Commission  May it please the Court, Your Honors, Counsel, I am Randy Sleutich here on behalf of J Squared Masonary, the plaintiff. I am here because it is my contention and my belief that the Commission and the Circuit Court did not get this case right. Not only did they not get it right, the result is a windfall for the petitioner, an abhorrent windfall. I'm well aware of the manifest weight of the evidence standard. I'm aware that in order for the Commission to be overturned, a clearly opposite conclusion must be clearly apparent and compelled by the clearly evident, plain, and indisputable weight of the evidence. As Counsel's brief puts it, a decision of the Commission is only against the manifest weight of the evidence when a review of the record discloses that the conclusion opposite to that reached by the Commission was clearly the proper result. To me, this standard exists because sometimes the lower courts get these cases wrong. To me, this appeal is an opportunity to look at the facts of this case and come to the clearly proper conclusion, which is, the petitioner is not and was not entitled to Section 8D1 wage differential benefits based on the conclusion that his injury prevented his return to correct life. Is the wage differential the only thing you're challenging here? Yes, Your Honor. Because all of the doctors, the employers, your own IME found that the claimant's current condition was causally related to the accident, correct? Correct. That's not in dispute? Correct.  The condition itself is not in dispute. Now, to illustrate what this case means in terms of numbers, the petitioner was awarded $12,000 for maintenance benefits from September of 2009 through November of 2009. So that's $12,000. Thereafter, he's entitled to $570.13 per week for life. At this point, $180,000 have accrued. Why is that relevant to the issue? The relevance is, I'm just explaining the award. We're well aware of the facts here, but use your time wisely and tell us why he's not entitled to an award regardless of the numbers. Okay, I was just illustrating the extent of the award, which I think is startling in terms of numbers. He happens to be a younger guy. I agree, Your Honor. So a wage differential is going to reap him a lot more benefits than an older guy. That's what you're telling us. Correct, and I'll move on. Now, as you stated, we're all aware of the facts. The petitioner worked as a commercial bricklayer for my client for two years. On November 15, 2007, he's using a table saw, and subsequent to that, experiences subscapularis pain, and he's diagnosed with brachial plexipathy. So during his treatment with Dr. Perona, which is his immediate treatment in 2008, Dr. Perona tries to figure out the extent of what kind of nerve damage does this man have, and what effect does it have on his ability to return to work as a bricklayer. Dr. Perona even sends the petitioner up to Dr. Marra in Chicago, and both agree that a functional capacity evaluation is warranted and needed to figure out if there's any strength deficits or impediments that preclude him from returning to work as a bricklayer. So he had two FCEs, correct? That's correct. And both of those established that he could not meet the physical requirements of the bricklayer occupation, correct? I do not agree with that. You don't? I do not. What were they? The first FCE was read by Dr. Perona, and he determined that he could return to his regular work as a bricklayer. So I don't agree. I mean, there were deficits shown, but as far as Dr. Perona was concerned, this man could return to his regular work. So an FCE standing on its own generally is not valuable. The doctor reads the results and comes to a determination on the person's work capabilities, which he did in this case on September 30, 2008. He said that the man could return as of October 6, 2008, quote, according to his functional capacity exam, the patient has reached his maximum medical improvement. We recommend that he return to his regular work duties on October 6, 2008. So, and he's also told to follow up on an as-needed basis. What about the other FCE? What did that conclude? That FCE concluded, according to the evaluator, that Mr. Gregoria, at that point two years later, was close to a return to work but needed work conditioning, which he never saw. And Dr. Eilers, based on that, not Dr. Perona, but Dr. Eilers, found that there were permanent restrictions and the man could not return to bricklaying. But I think that in order to assess the validity of something like that, you have to look at what happened in those two years between the first FCE and the second, which are generally the same. So you actually have two different doctors' opinions on the same FCEs? You said both FCEs are equivalent? Correct. You have two separate opinions. Well, you have Dr. Perona's opinion in 2008, and then he's brought Dr. Eilers and the new FCE, and he's now saying the man can't return to bricklaying. Okay, but you did say both the FCEs were roughly the same? Correct. Okay. So you have a different medical opinion as to what that may mean. Correct. Okay. So what's significant to me is that the petitioner never returns to treat with Dr. Perona. Now, he does go back in 2010 with this new FCE, but it's not for treatment, and as he says when he gets there, he's trying to settle his case. So that was a move for litigation at that point. Dr. Perona was asked to prescribe another FCE and refused, and that's why Dr. Eilers ended up prescribing it, and he's the petitioner's IME doctor. So don't you have conflicts in the evidence here? The arbitrator specifically stated he gave greater weight to the conclusions reached by Dr. Eilers and Mr. Pagela that Klayman could no longer perform the physical requirements of the occupation. As you know, the commission adapted that. So tell us why they couldn't do that. Well, I don't think they can do that because I think when we're talking about the manifest weight, I think we have to rely on Dr. Perona, and I think the commission failed to see what happened in the two years between when he was released to go back to regular work and when Dr. Eilers got involved in the litigation. Well, why would they have to rely on Perona? What rule of law says they have to rely on Perona? There is no rule of law that says they have to rely on that. I agree. Okay. And you're saying Perona said no limitations, no restrictions, go back and lift those bricks and lay them, right? Yes. Yes, Your Honor. The problem was that the arbitrator specifically said that he gave no weight to the fact that Perona released the claimant to work for an undetermined duration. Again, does he have to believe Perona? No, he doesn't have to. So I'm intrigued by your comment that they have to believe Perona. Well, I think that Perona, along with the rest of what happens over the next few years, creates what I believe can overcome the manifest weight in showing that the decision was not correct. Okay. What happened? Give us a tour of that. Sure. So after Dr. Perona releases the man, he actually does go back to Brick Lane for two other companies. Now, they're short periods of time, but when he testifies as to what happened during those times, he says, I worked for a short period of time. When the work dried up, I was done. I was laid off. So now we know that he could return to Brick Lane. He did return to Brick Lane, just not for my client. And what this all gets to is the fact that eventually he resigns from his union because the work's dried up. The letter that he writes to his union president is clearly laid out in my brief, and he says it's for economic reasons. He expresses his wish to return to Brick Lane when there's more jobs. In the meantime, he takes a job at the Walmart distribution center, where he's making less money, obviously, than Brick Lane. But at that point, with the way the economy was in those years, Brick Lane had dried up. But he doesn't say, you know, because of my medical condition, I can't return to Brick Lane. He doesn't go back to Dr. Verona and say, I've tried Brick Lane, and I'm still hurting. I, you know, I need restrictions. None of that occurs. He doesn't say that in the letter that he wrote to the union that he testified to. As far as why he did not go back to Brick Lane? Right. He says he's quoted as saying that he didn't want to work. He felt he couldn't do it anymore, and then he looked at other guys, older guys, and didn't want to put his body through that stress. Didn't he say he didn't want to put that in the letter to the union, but he really couldn't do it, couldn't do the job anymore? That was his testimony. And didn't the union person testify there was no need for him to say that in his letter? The union person did testify that he wouldn't have to put that in the letter, but that union person specifically had no knowledge of Mr. Pagoria's interactions or anything that had happened with his specific case. I mean, he testified generally as to, you know, what you do to maintain your union dues, what the pay scale is, things of that nature. But he had no personal knowledge of what Pagoria's communications with the union were. Did the claimant explain why he put in the letter what he put in the letter, and the commission credited that testimony? Well, correct. I mean, the petitioner on many occasions gave self-serving testimony as to why he said certain things at certain times, why he didn't tell the first FCE evaluator the full extent of his job. Anybody who doesn't give self-serving testimony? Good point, Your Honor. So my focus is what happened in those two years, and what does he tell his union? And to me, when he tells his union he's not coming back for economic reasons, that sounds to me not like a man who can't be a bricklayer. It's a man who doesn't want to go through the ups and downs of waiting for bricklaying jobs to become available. You know, the work has dried up. He's frustrated, and he says it clearly in his letter that he's willing to come back to bricklaying when the jobs are there. And at that point, he doesn't have a medical restriction, and he goes and gets another job, which, you know, that's advisable, and it's good that he went and got another job, but it's his choice to leave the bricklaying field. It's not his restrictions. You know, he goes back to being an unloader at Walmart, and he's lifting 40 to 50 pounds, just as what he testified he has to do as a bricklayer. So another thing is, I mean, to even further clarify his intentions when he applies it. Is there a difference in the consistency or frequency of that weight? I thought it was something about 60 pounds, wasn't it? His testimony says he has to lift the bricks that are 40 to 50 pounds, and if there's anything else, he gets assistance. They lift it together. Right, but then in terms of bricklaying, that's a constant, isn't it? And was his testimony that it was infrequent or not as frequent? No, I mean, I think it's – I don't remember that his testimony said it was constant or infrequent, but I think when you're talking about comparing lifting bricks and being an unloader, which is your title, I think it's assumed that both involve consistent and constant lifting, which in this case happened to be at the same level. It might surprise some people that working at Walmart is more stressful than being a bricklayer. Well, it's a distribution center. Well, no. I agree. And one thing I want to point out is when he applies at Walmart, he again tells us why he's not a bricklayer anymore. It says, why did you leave bricklaying? Why did you leave J-squared masonry? He writes, lack of work. Why did you leave Palos Masonry? Lack of work. Do you think he's going to get a job if he doesn't say that or if he says anything else? I would agree with you, Your Honor, but that put together with everything else seems to fit with why he left bricklaying. Who's Benoit? Benoit is the union representative for the local six called by a petitioner to testify. And he said himself on the subject that you're saying is very strange that he did not expect the claimant himself to divulge his medical condition when he resigned from the union. So the union guy thought that was perfectly normal, didn't he? That's what he testified to. He said it was not expected. Correct. It's not expected that they divulge their medical condition. I mean, wasn't it a reasonable inference for the commission to conclude that the claimant was just trying to keep his options open to go back to bricklaying someday if he could do it? Right. Rather than saying, I can never do bricklaying again, so I resigned from the union. Well, and I think that's my point, Your Honor, is that he was keeping that option open while his case was in litigation. And some of the testimony was he'd like to go back and make that money. Right. He said he can't do it. So I guess I would close, Your Honor, with – well, actually, one of the things I want to point out is that the commission relied upon Mr. Pagela, who is a purported VOC expert in this case. And in relying upon him, I think that's faulty. I think when you have a VOC expert who says, this man can't return to bricklaying because I watched someone install a house, I think that's a very difficult proposition and hard to accept as far as being credible evidence in the case. And I understand they have the latitude to decide whether that's credible, and that's not an issue. But it's something that, again, fits with all of this is, though, Petitioner could return to bricklaying and stated that he would like to. So I close with saying that I think the commission's decision was against the manifest way of the evidence. It would hold my client responsible for Petitioner's choice to leave bricklaying and for the economic downturn that was happening at this time. So I would respectfully request that the decision be reversed and that the case be remanded for a specific loss as opposed to wage deferential under Section 81. Thank you. Thank you, Counsel, for your argument. You may respond. May it please the Court, Counsel, my name is Tommy Stroud, here today on behalf of the Petitioner, Anthony Pagoria. Your Honors, frankly, my preference would be to stand in my brief today because this is a manifest way to the case with two functional capacity evaluations that keep this gentleman from being a bricklayer. The union steward indicating that both of those FCEs that were valid put him outside the role of bricklaying, even put Ed Pagel aside, take him outside the role of bricklaying. That establishes the first prong. And the only evidence on the second prong of the AD-1 is the testimony that the Walmart job was a satisfactory secondary wage for him to have. We've established the wage impairment based on the greater weight of the evidence. This is not a manifest way to the evidence case that should be overturned. So unless Your Honors have any questions, I stand on my brief. I just have, not that I would want to deter you from being brief and giving us additional time, but what do you make, he's saying Dr. Perona released the claimant to work, to return to unrestricted work on October 6, 2008. What's your response to that? Well, Your Honors, I point out in my brief, too, it's sort of a funny thing actually looking at the evidence to put all the eggs in Dr. Perona's egg and end up breaking a couple years later when you have Dr. Perona himself, which counsel doesn't mention again today and they don't really look at in their brief. Dr. Perona supports my case because Dr. Perona ultimately says in looking at the FCE, I now release him per the second FCE. So Dr. Perona ultimately, looking at his original release in 2008, when he had the little box on the return to work form, when it gives how long are these, this work status for, he checked undetermined. So it was yet to be determined what the permanent condition of the petitioner was going to be. And during that time where he was released to this quote-unquote regular duty, the commission properly found, and so did the arbitrator, he would not have been entitled to any further off work benefits during that time. During the period, he held himself out still to have the potential to be a bricklayer. Granted, he only did it for a short period of time for a couple of employers. But during that time, he wasn't entitled to benefits. It's once he finally acquiesced to the reality of his objective physical restrictions that his entitlement to further benefits then accrued. But Dr. Perona does not support their case. Dr. Perona supports our case. In fact, it's not a matter of conflicting medical opinion because there's no medical opinion, really, other than Dr. Breslow, who was found not credible by the commission on other issues, including causation. But curiously about Dr. Breslow, his opinion was, yes, I understand he has these two FCEs, but I think if he gets a third FCE, well, then I'll believe that one. I mean, how many does the petitioner have to get before it's believable that he actually has valid permanent restrictions? Should he get five or ten? He's already had two, both that said he had permanent restrictions. Again, Jody Benoit, the union steward I had come testify, says, look, you don't send anybody out that has restrictions as a juryman bricklayer. That's just the reality. Now, again, during this period of time for which benefits weren't awarded and on that original release of Perona, he tried to do it. He couldn't do it. He realized he couldn't. And we have the evidence to support that he can't do it. It establishes the first prong. So respectfully, I don't think Perona supports their case. So if they want to keep talking about him, great, because once your honors actually see what he said, you'll see it supports my case. Any further questions? I don't believe there are. Thank you. Counsel, may I reply? Okay. Yes. I would like to. Thank you. I would only answer that Mr. Benoit, as a union steward, has no province to read an FCE or make a determination. All of his determinations were on a general basis. And I would, again, say that according to whatever permanent restrictions he had in 2008-2009, he didn't return to work as a bricklayer. And I'll close with that. Thank you. Thank you, counsel, both for your arguments in this matter. This morning will be taken under advisement. A written disposition will issue.